**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

IN RE:

**DENNIS R. STIFF**                                                              **CASE NO. 12-53085**

**THE DEBTOR**

**SAMUEL K. CROCKER, U.S. TRUSTEE**                                 **PLAINTIFF**

**VS.**                                                                   **ADVERSARY CASE NO. 13-5030**

**DENNIS R. STIFF**                                                                **DEFENDANT**

## MEMORANDUM OPINION

In this action, the United States Trustee seeks denial of discharge to the Debtor, a bloodstock agent, based on 11 U.S.C. §§ 727(a)(3) and 727(a)(5). The U.S. Trustee alleges the Debtor failed to keep records that would help assess his financial condition and explain the loss of certain assets. The U.S. Trustee raises questions with the disposition of two loans, cash withdrawals over a seven-year period, funds which the Debtor solicited from investors to purchase horses and interests in horses, and shares in a syndicated stallion.

The purpose of § 727(a)(3) and § 727(a)(5) is to "remove[] the risk to creditors of 'the withholding or concealment of assets by the bankrupt.'" *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008) (quoting *Burchett v. Myers,* 202 F.2d 920, 926 (9th Cir.1953)). The testimony suggests the Debtor may have grossly mismanaged his investors' money and it is clear his recordkeeping was poor . Still, it seems clear where the money in this case went: the Debtor spent it. Thus, a denial of discharge grounded on provisions enacted to check the concealment of assets from creditors is not warranted.

I.      **FACTS AND PROCEDURAL HISTORY.**

The facts, procedural history and issues for trial were set up in the Memorandum Opinion which denied the Debtor's motion for summary judgment. [Doc. 29; published at *Crocker v. Stiff (In re Stiff)*, 512 B.R. 893 (Bankr. E.D. Ky. 2014)]. The Memorandum Opinion describes the procedural history as follows:

> Debtor filed a Chapter 7 petition for bankruptcy on December 7, 2012. Debtor listed nine judgment debts on his petition. On March 15, 2013, several of Debtor's scheduled judgment creditors filed a nondischargeability action, generally alleging that their judgments against Debtor were for fraud and hence non-dischargeable. On June 7, 2013, that adversary proceeding was voluntarily dismissed. On August 28, 2013, the U.S. Trustee filed this adversary proceeding, objecting to Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A) (concealment of assets with intent to hinder or delay creditors), 727(a)(3) (failure to maintain records), and 727(a)(5) (failure to explain the loss of assets). The U.S. Trustee subsequently dismissed the § 727(a)(2)(A) count, explaining at the hearing on Debtor's motion for summary judgment that he dismissed the count because he was unable to find evidence that Debtor concealed any assets within one year prior to the commencement of Debtor's case, as § 727(a)(2)(A) requires.

*Stiff*, 512 B.R. at 895.

The Debtor's summary judgment request essentially argued for a two-year limit on the look back period for a non-dischargeability action under either § 727(a)(3) or § 727(a)(5). The Memorandum Opinion concluded there was no outer limit; the time period merely affected the reasonableness of the failure to keep records or the need to explain a loss of assets. *Id.* at 898-901. With respect to lost assets, a normal two-year look-back period may be extended with respect to substantial assets relative to a debtor's liabilities. *Id.* at 900-01. The Memorandum Opinion further explained that the length of time a debtor is required to keep records will depend on the nature of the business in which the debtor is engaged, the size of the transaction, and other facts and circumstances of the case. *Id.* at 898-99.

The Memorandum Opinion further recognized a burden-shifting framework that places the initial obligation to show missing records or a loss of assets on the U.S. Trustee. Once the

U.S. Trustee proves that a debtor failed to keep records of the kind required by § 727(a)(3), the burden shifts to the debtor to explain why his failure to keep the records was reasonable. The U.S. Trustee also has the initial burden to identify certain assets previously owned by the debtor that he no longer possesses. Once that occurs, the debtor must explain the loss of those assets.

The Memorandum Opinion recognized four asset groups identified by the U.S. Trustee that would require additional proof:

> (i)  the U.S. Trustee argues that Debtor has failed to explain the loss of the $194,000 cash withdrawn from two bank accounts from 2002 to 2009;
> (ii) the funds owed on a $55,000 note payable in 2004 and a $35,000 note payable in 2006;
> (iii) funds solicited to invest in stallion seasons and broodmare prospects in 2004 and 2005, and
> (iv) interests in Equality, a stud horse, transferred between 2003 and 2009.

*Crocker v. Stiff*, 512 B.R. at 896 (organized in the order of presentation herein).

The Memorandum Opinion determined that the Debtor had not established as a matter of law that his failure to keep records regarding these items was reasonable. *Id.* at 899. It reserved on whether the U.S. Trustee had met its burden to prove that Debtor failed to keep § 727(a)(3) records. *Id.* at 897 n.2. On the § 727(a)(5) count, the Memorandum Opinion held that the U.S. Trustee had shown that some explanation was required as to the cash and promissory notes, items (i) and (ii), but it was not yet clear an explanation was required for any loss related to the investments in stallion seasons and broodmares or the shares in Equality, items (iii) and (iv). *Id.* at 901. Further proof of the materiality of these assets, given their remoteness from the bankruptcy, would be required at trial. *Id.*

## II. ANALYSIS.

### A. Item (i): Cash Withdrawals.

The U.S. Trustee identified $194,000 that was taken from the Debtor's personal account and the business account of Bay Bloodstock between 2002 and the first half of 2009. The Debtor testified that the U.S. Trustee's calculation does not give credit for $74,000 that was redeposited into the Bay Bloodstock account. The Debtor also asserts the U.S. Trustee's calculation does not account for a $33,000 check that was initially rejected for lack of endorsement, but later corrected. If true, the Debtor must only account for cash totaling $87,000.

**1. The Debtor's Failure to Keep Records for the Cash Withdrawals Does Not Justify a Denial of Discharge under § 727(a)(3).**

The Debtor's failure to keep detailed records explaining his use of $28,000 a year in cash (or by the Debtor's calculation, about $12,500 a year) for a period beginning ten years, and ending over three years, before the petition date is not unreasonable. As discussed in more detail hereafter, the Debtor credibly testified that he spent the cash he withdrew on personal living expenses, including food and living accommodations, vacations, jewelry, gambling and certain aspects of his business. Even the U.S. Trustee's expert witness on accounting issues, Todd Wright, testified that individuals would not normally keep records of ordinary living expenses going back more than two or three years. Further, some records had deteriorated and were discarded, which is not surprising considering the extended time period involved in this review.

**2. The Debtor Has Adequately Explained the Use of the Cash Withdrawals, so a Denial of Discharge under § 727(a)(5) Is Not Warranted.**

The U.S. Trustee met his burden under § 727(a)(5) to show that the Debtor possessed substantial cash assets prior to bankruptcy which he no longer possessed, shifting the burden to the Debtor to explain the loss. The Debtor testified in considerable detail about his cash expenditures, both specifically and in general.

The Debtor and his witnesses testified that he spent approximately $20,000 on racing forms and gave $7,000 to Bob Greenbaum during the relevant period. The Debtor's former partner, Sheila Bayes, testified that the Debtor spent approximately $10,000 cash on jewelry for her at her store during the relevant time period. The Debtor testified that he lost approximately $204,000 gambling from 2002-12. While the Debtor provided nothing to support this amount, he testified that the gambling receipts that would have substantiated it became too faded to read and were discarded prepetition.

The Debtor also provided testimony regarding expenditures that he could not specifically quantify. The Debtor and Bayes said they took several expensive vacations a year during the relevant period, including trips to Hawaii, Paris, Las Vegas and the Caribbean. Both the Debtor and Bayes testified that the Debtor paid cash for most expenses on these vacations. The U.S. Trustee countered the Debtor's claims that he used large sums of cash on vacations by showing limited travel deductions on the Debtor's tax returns. [Debtor's Exs. 1-3.] But the Debtor's explanation that many trips were not subject to deduction because they were for pleasure or were made as a companion of his partner on her business trips is reasonable.

The Debtor also testified that he has used cash for most purchases his entire life. Bayes confirmed the Debtor usually paid for items with cash during their fourteen years together. the Debtor testified that he spent reasonable sums on food and other living expenses, including periodic payments to Bayes to compensate for rent. The parties accounted for one significant check for a domestic support obligation, but the Debtor claims he made other monthly payments in cash.

The final general area of cash expenditures involved the Debtor's efforts to locate horses for clients, including his syndication efforts hereafter discussed. The Debtor did not give

5

significant detail, but did testify that many times the expenses incurred to locate horses for his clients or him ended without success.

A satisfactory explanation is not always meritorious or proper; it need only convince the court that a debtor has not hidden assets. *See First Am. Bank of N.Y. v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 33 (Bankr. E.D.N.Y. 1994); *see also Kaler v. Huynh (In re Huynh)*, 392 B.R. 802, 813 (Bankr. D.N.D. 2008). The Debtor's explanations for use of the cash withdrawn from the two bank accounts are credible. This is particularly true considering a significant portion of the cash withdrawals occurred many years ago. A review of the U.S. Trustee's exhibits bears this out.

The $115,430 in withdrawals from the Bay Bloodstock account, but not deposited into the Debtor's personal account at Citizens Commerce, all occurred in 2006 or before. [Debtor's Ex. 6.] Also, over $30,000 of the $43,545 in checks written for cash from the Citizens Commerce account occurred in 2007 or before. [Tr. Ex. 7.] Further, of the $83,230 in ATM withdrawals, over $60,000 occurred in 2007 or before. It is not surprising that the Debtor cannot specifically describe the use of funds at least five years before the bankruptcy filing on these facts.

This extended period also likely accounts for the lack of significant contrary evidence from the U.S. Trustee. Therefore, the Debtor has met his burden to offer a satisfactory explanation for the use of the cash withdrawals over a seven-year period reaching back ten years from the petition date.

> **B.** **Item (ii):  The Promissory Notes:  The Evidence Does Not Justify a Denial of Discharge.**

In addition to the cash withdrawals, the U.S. Trustee could not trace receipt of two promissory notes into the Debtor's bank accounts. The Debtor executed a promissory note for

$55,000 in August 2004 to Steve Prain [Tr. Ex. 16], and a promissory note for $35,000 in December 2006 to David Greathouse [Tr. Ex. 17]. The evidence in the record sufficiently explains the use of these funds.

At trial, the Debtor testified that he executed the $55,000 note to memorialize a series of obligations owed to Prain accrued over the preceding three years. The U.S. Trustee's summary exhibit of deposits in the Bay Bloodstock account involving Prain totaled over $129,000 between 2002 and 2004. [Tr. Ex. 5.] Not only were these amounts in the Debtor's records provided to the U.S. Trustee, but the U.S. Trustee's calculation of the cash withdrawals includes the deposits. Therefore, the prior explanation of the use of the cash withdrawals adequately addresses any use of the $55,000 note proceeds. *See supra* at Section II.A.

The Debtor testified that the $35,000 note reflected a $25,000 loan made earlier in 2006 and an additional $10,000 to reflect interest and a premium because the Debtor could not pay the debt when due. The U.S. Trustee's summary exhibit of deposits into the Bay Bloodstock account shows that the Debtor did deposit a $25,000 check from Greathouse in May 2006. [*Id.*] Therefore, like the $55,000 note, the Debtor's record keeping is adequate and the use of the funds explained.

Discharge is not warranted under either § 727(a)(3) or § 727(a)(5) related to issues surrounding the promissory notes.

    **C. Item (iii):  The Investment Pools:  The Evidence Does Not Justify a Denial of Discharge.**

The U.S Trustee has raised an issue regarding the possibility the Debtor did not account for funds received from his solicitations to participate in investment pools. The U.S. Trustee provided a prospectus from 2004 declaring the Debtor's intention to raise $200,000 from investors to purchase stallion seasons. [Tr. Ex. 14; *see also* Doc. 26, Ex. 2.] The U.S. Trustee

7

also provided information to suggest the Debtor solicited funds in 2005 to buy broodmare prospects. [Tr. Ex. 15].

Notwithstanding the possibly large numbers involved, the U.S. Trustee only showed that the Debtor received $40,000 from Equi-Par, Inc., a company owned in part by the witness, Belinda Reeves, and an unspecified amount invested by Mark Basinger. The Debtor did not produce any information regarding funds received from other investors in 2004 or 2005. There is also no information in the record to suggest the Debtor received investments other than from Equi-Par and Basinger. Absent such proof, the only issue is whether the Debtor should have kept records, or explain the use, of funds from known investors.

The Basinger investment is immediately discounted because there is no information to justify a conclusion the amount involved is material. It is not only necessary to show funds were received, but also that the amount was substantial enough to require an explanation from the Debtor over nine years later. The U.S. Trustee and the Debtor did not elicit testimony regarding this investment, other than a comment from the Debtor that investing in broodmare prospects is highly risky. Therefore, it is not possible to find the Debtor should have kept records or further explain this investment.

A reasonable blood stock agent would, or at least should, keep records of an investment such as that made by Equi-Par. But the failure to keep records of a $40,000 investment made eight years before the petition date is not unreasonable. One relatively small receipt by a bloodstock agent with a long career of buying and selling horses is not the type of transaction that mandates an explanation more than eight years later. The amount is also not significant relative to the Debtor's scheduled liabilities of $700,000.

8

Moreover, any concern regarding the Equi-Par investment is allayed by the fact that the money was only a paper debt. The Equi-Par investment did not involve delivery of $40,000 cash to the Debtor. Equi-Par loaned the Debtor $40,000 to purchase the stallion Equality, discussed infra. [Tr. Ex. 8.] Instead of repaying that loan, Reeves testified that Equi-Par agreed to roll the funds over into the 2004 stallion season offering. But there was no showing that the Debtor actually had $40,000 to repay the debt. Even if he did, the discussion of the use of the cash withdrawals would address any such funds.

These amounts are simply too small and too old to require much from the Debtor to avoid a denial of discharge.

### D. Item (iv): Equality.

In 2004, the Debtor established a 40-interest syndicate for a stallion named Equality that would stand stud in Michigan. The U.S. Trustee could only trace the disposition of 26 of the 40 interests by reviewing memo lines on checks, leaving 14 interests in question. The U.S. Trustee did offer evidence showing that the interests could have some value, including (i) a summary exhibit of transactions in Debtor's bank accounts indicating investors generally paid $5,000 for an interest in Equality in 2003-04 [Tr. Ex. 9], and (ii) a compilation of advertising for Equality suggesting that Equality's progeny were successful racehorses in 2006. [Tr. Ex. 10 at 2.]

Other than the syndication and breeding information described, the Debtor provided no records regarding Equality to the U.S. Trustee. The U.S. Trustee, through the expert testimony of Todd Wright, showed that the Debtor, as the syndicate manager, should have maintained records of the owners of the interests, use of the related breeding rights and the receipts and expenses of the horse. Further, the shareholders would expect periodic reports of this information to evaluate the profit or loss associated with their ownership interests.

9

At trial, the Debtor provided names of the initial owners of the interests in Equality from a list he kept on his cell phone. Sheila Bayes, who originally owned five interests, testified that she had seen shareholder lists. The Debtor also claimed under cross examination that he kept the records Wright said he should have kept. He did not think he had to produce the records because the shares in Equality were sold in 2009, and thus not part of his estate.

1. **The Debtor's Failure to Keep Records Regarding Equality Does Not Justify a Denial of Discharge under § 727(a)(3).**

There is no doubt the Debtor withheld records relating to ownership of his interests in Equality, even though he was put on notice this information was at issue by the Memorandum Opinion. Further, the U.S. Trustee persuasively established that the Debtor's recordkeeping practices fell well below the norm in his business. These records are not, however, the type of material information required to determine the Debtor's financial condition.

Records of who owned Equality and the expenses associated with upkeep of the horse only tangentially go to the financial condition of the Debtor. The importance of this information is also lessened when the value of the interests in Equality is considered. *See infra* at Section II.D.2. The lack of recordkeeping is, therefore, not material. *See Pelarinos v. Henderson (In re Henderson)*, 195 B.R. 6, 8 (Bankr. D. Conn. 1996) (requiring missing records which make it "impossible to ascertain the Debtor's financial condition and material business transactions"); *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994) (same); *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d. Cir. 1992) (same).

The U.S. Trustee did not meet his initial burden to prove an absence of records from which he could ascertain the Debtor's financial condition or material business transactions.

### 2. The Debtor Has Adequately Explained the Equality Interests, so a Denial of Discharge under § 727(a)(5) Is Not Warranted.

The Debtor read the list of initial owners of Equality interests from his phone, including the 26 shares the U.S. Trustee had traced in his document review. The Debtor's testimony described eight additional transfers, including a gift of five interests to Sheila Bayes, leaving only six interests held by the Debtor (or his aliases). The U.S. Trustee did not object to this information or otherwise question its veracity, and the Court accepts it as true.

The Debtor also testified that he transferred his interests in Equality in 2008 or 2009, but he did not explain who received the interests or whether he received compensation. Instead, the Debtor testified that by the time he disposed of his interests in Equality, the costs of upkeep exceeded any return from breeding the horse. The Debtor explained that a major racetrack in Michigan closed a couple of years after the syndication, just when the first offspring of Equality were old enough to race. When the track closed, the number of horses bred in Michigan dropped precipitously. This testimony was not contradicted and there is no reason to doubt it.

The Debtor's lack of information regarding the purchaser of the interests is troubling, but even if the interests were not sold, the value was minimal. Further, the transfer was at least three years before the bankruptcy, outside what the Memorandum Opinion found was a normal look-back period. *See Stiff*, 512 B.R. at 900-01. Therefore, the burden was on the U.S. Trustee to prove that the shares had material value to the Debtor's estate. The U.S. Trustee only showed the Debtor did not provide an explanation before the trial, but the Debtor's uncontroverted testimony showed his interests had little value and he disposed of them to avoid further losses.

### III.    CONCLUSION.

This objection to discharge asked whether the Debtor failed to keep records relevant to his financial condition and material business transactions or explain the disposition of assets

material to his bankruptcy case. The trial in this matter established that the Debtor's recordkeeping practices were poor and his business practices questionable, but the Debtor was not on trial for fraud or poor accounting procedures. For certain assets, the U.S. Trustee did not submit enough information to force the Debtor to explain the lack of record keeping or a loss of assets. When the U.S. Trustee did provide sufficient information to shift the burden, the Debtor's response was sufficient to avoid denial of a discharge.

The proof from the U.S. Trustee suggested he pursued this action because the Debtor may have committed fraud in his dealings with Equi-Par or other investors that were never made part of the record. The U.S. Trustee also proved the Debtor did not account for some of the receipts for sale of interests in Equality on his 2004 tax return.

Failing to file accurate tax returns and fraud are serious charges. But they ultimately do not have a material impact on this decision. Allegations of fraud or improper tax returns might support a § 523 action or § 707 bad faith claim, but they are a poor fit for a non-dischargeability action under § 727(a)(3) and § 727(a)(5). Actions under § 727(a)(3) and § 727(a)(5) are directed to discovery of debtors that are hiding assets, not those that appear insolvent (even if they lived in a gray area).

A separate order will enter denying the U.S. Trustee's objections to discharge and granting judgment in favor of the Debtor.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Friday, October 03, 2014**
(grs)